SIMON GLIDEWELL, Respondent, v. QUINCY, OMA-
HA & KANSAS CITY RAILROAD COMPANY,
Appellant.

Kansas City Court of Appeals. December 5, 1921.

1. INTERSTATE COMMERCE: Test as to Whether Employee En-
gaged Therein: Employee Injured while Carrying Drawbar Belong-
ing to Engine Used in Interstate Traffic, Held, Engaged in Inter-
state Commerce. In an action for personal injuries brought under
the Federal Employers' Liability Act, (U. S. Comp. St. Secs. 8657-
8665), where a blacksmith was injured while carrying a drawbar
belonging to an engine assigned to the work of hauling passengers
between points in the States of Missouri and Illinois, it is held,
that plaintiff was engaged in Interstate Commerce within the
meaning of said Employer's Liability Act, the test being the
character of the work done and whether the same was in direct
furtherance of Interstate Commerce or work so closely connected
with Interstate Traffic as necessarily to become a part thereof.

2. NEGLIGENCE: Master and Servant: Defendant Held Negligent
in Permitting Scrap Iron to Remain in Passageway Used by Em-
ployee. Where plaintiff was injured by stepping upon a piece of
scrap iron in a passageway causing him to stumble, while walking
backward through said passageway, carrying a heavy drawbar,
the defendant was negligent in permitting the scrap iron to re-
main in the passageway when defendant's foreman knew that
plaintiff would use the passageway in the manner in which he did
use it.

3. ———: Fellow Servant: Interstate Commerce: Plaintiff Engaged in
Interstate Commerce Held Entitled to Recover Even Though Injured
by Negligence of Fellow-Servant not Engaged in Interstate Com-
merce. Plaintiff who was engaged in Interstate Commerce, was
entitled to recovery no matter how long piece of scrap iron re-
mained in the passageway, and even though he was injured by
reason of negligence of a fellow-servant who was not engaged in
Interstate Commerce.

4. MASTER AND SERVANT: Assumption of Risk: Plaintiff Injured
in a Passageway by Stepping upon a Piece of Scrap Iron Causing
Him to Stumble, Held, not to have Assumed the Risk Under the
Federal Rule. Where plaintiff was injured while required to walk
backward through a passageway which was the only one that could

Glidewell v. Q. O. & K. C. R. R. Co.

have been used by him, he had a right to assume that his foreman would not order him to do work that would require him to walk backward through said passageway without knowing that the same was free from obstructions, and under the federal rule plaintiff did not assume the risk of being injured as he had the right to assume that the passageway was clear.

5. **INSTRUCTIONS: Where the Evidence on a Certain Point was Uncontradicted, Failure to Instruct Thereon was not Error.** Where the evidence was uncontradicted that plaintiff was injured while engaged in Interstate Commerce, an instruction which did not require the jury to find plaintiff was injured while so engaged was not erroneous.

6. **————: Negligence: Where Court Defined Negligence an Instruction is not Erroneous as Requiring Defendant to Make Passageway Absolutely Safe Instead of Reasonably Safe.** Where an instruction was given defining negligence as a failure to exercise ordinary care, and that by ordinary care is meant that degree of care usually exercised by careful persons under the same or similar circumstances, the giving of another instruction by the Court to find for plaintiff if defendant permitted scrap iron to remain in a passageway, and that said passageway was thereby rendered dangerous and unsafe, by reason whereof plaintiff was injured, was not erroneous as requiring defendant to make the passageway absolutely safe instead of reasonable safe.

7. **DAMAGES: A Verdict of $4000 for Injuries to Spine, Back, Loss of Weight, Nervousness, Sleeplessness, and Incapacity from Hard Work, Held not Excessive.** Where plaintiff, a blacksmith, suffered from sharp pains in spine and back and a sub-luxation of the lumbar vertebrae, was very nervous, unable to sleep, lost weight, incapacitated from walking to extent he did prior to injury and for over a year could not perform any physical labor and from which condition more than three and a half years after the injury he had not recovered, a verdict of $4000 is *held* to be not excessive.

Appeal from the Circuit Court of Sullivan County.—
*Hon. Fred Lamb,* Judge.

AFFIRMED.

*E. B. Fields* and *J. M. Wattenbarger* for respondent.

*J. M. Clapp, D. M. Wilson* and *J. G. Trimble* for appellant.

BLAND, J.—This is an action for personal injuries brought under the Federal Employers Liability Act. Plaintiff recovered a verdict and judgment in the sum of $4000 and defendant has appealed. This is the second appeal in the case. [See Glidewell v. Q. O. & K. C. R. R. Co., 204 S. W. 37.]

On January 31, 1916, plaintiff was in the employ of the defendant as a blacksmith at its roundhouse located at Milan, Missouri. On that day plaintiff was engaged in shortening a heavy piece of iron called a drawbar, which weighed about 200 pounds and was used to connect one of defendant's engines and tender. The shortening of the drawbar was finished and plaintiff and another workman were carrying the same from the roundhouse by order of plaintiff's sub-foreman, Hall. Plaintiff had hold of the front end of the bar with his back in the direction in which he was going. After plaintiff had taken a few steps, not seeing in the direction in which he was going, he stepped on a piece of scrap iron that had been thrown in the passage, causing him to stumble against a piece of smokestack which struck him in the back and the drawbar caught in his stomach. When he fell plaintiff caught his arm on the smokestack but did not strike the floor. He got up with the drawbar and proceeded out of the roundhouse and laid it down. Through the assistance of his helper plaintiff was taken to the depot, suffering with pain in his back and the back of his head. He was sent home from the station in a buggy.

The blacksmith shop consisted of one large room containing four forges, anvils and other appliances used in iron work. About twenty-five men were employed there. Plaintiff was in charge of one of the forges. The shop had two large doors on the west side and a smaller one in one of the larger doors. A standard gauge railroad track entered the shop through these doors and extended beyond plaintiff's forge which was the middle of the shop. The usual way of passing in and out of the blacksmith shop was along the railroad track and

through the small door.  Another workman was cutting up a smokestack on the railroad track obstructing the regular passage, which required plaintiff to walk along the north side of the railroad between the track and his forge and the clamp of his sub-foreman Hall.  This passageway was about two feet in width.  At the clamp there was a pile of scrap iron.  When plaintiff reached this point he tripped over the scrap iron and fell against a section of the smokestack which protruded over the north side of the railroad track.  The drawbar upon which plaintiff was working at the time of his injury belonged to engine No. 12 of the defendant.  The evidence shows that engine No. 12 was used by the defendant in its passenger service from Milan, Missouri, to Quincy, Illinois, to quote the evidence in regard to this matter— "Q. What was that engine used for?  A. Passenger service.  Q. From where to where?  A. From Milan to Quincy."

It is insisted by the defendant that the court erred in refusing to give defendant's instruction in the nature of a demurrer to the evidence at the close of all the evidence, for the reason that plaintiff was not engaged in the furtherance of interstate commerce at the time of his injury and he, having brought his suit under the Federal Employers Liability Act, could not recover on evidence showing liability, if any, under the common law of Missouri.

We think there is no merit in this contention.  We construe the evidence in reference to the matter to be that the engine, a part of which plaintiff was working upon, was devoted exclusively to interstate commerce, being used in the passenger service from Milan, Mo., to Quincy, Ill.  The plain inference from the evidence is that the engine was permanently assigned to this work between these points.  Defendant contends "that there was no proof as to how long engine No. 12 had been out of service or when it returned to service or whether it was engaged in interstate commerce afterwards.  There was no proof the drawbar was afterwards used

on engine No. 12 or in some other engine or used at all.'' ''Repairs were being made in the shop and not on the engine while it was waiting on the track to go upon an interstate trip.''

It is true that there was no evidence as to what use the engine was put to after it was repaired or wheth- er the drawbar was put back into the engine. However, the evidence shows that this drawbar belonged to the engine and that the engine was assigned to the work of hauling passengers between Milan, Mo., and Quincy, Ill. We think there is no question but that plaintiff was engaged in the furtherance of interstate commerce in repairing part of this engine. He was making this instrumentality of interstate commerce fit for the uses intended, that is, commerce between the States of Mis- souri and Illinois. [Minneapolis & St. Louis .R. R. v. Winters, 242 U. S. 353, 356; Pedersen v. Del., Lack. & West. R. R., 229 .U. S. 146.]

We fail to see what difference it would make whether the work was being done in a blacksmith shop or while the engine was standing upon the track waiting to make an interstate run. It would make no difference where the work was being performed. The place of the doing of the work was certainly not the test but the charac- ter of the work being done, whether the work was be- ing done in direct furtherance of interstate commerce or work so closely connected with interstate traffic as necessarily to become a part thereof; this is the test to be applied. [Manes v. St. Louis-San Francisco Ry. Co., 220 S. W. 14, 16; Shanks v. Railroad, 239 U. S. 556, 558; Pedersen v. Railroad, supra; Chicago, Burlington & Quincy Railroad v. Harrington, 241 U. S. 177.]

It is insisted that the demurrer to the evidence should have been sustained for the reason that there was no negligence shown. We think there is no merit in this contention. The petition alleges that plaintiff ''step- ped on some scrap iron, which defendant, its agents, servants and employees, had negligently and carelessly placed and permitted to be and remain in said passage-

Glidewell v. Q. O. & K. C. R. R. Co.

way.'' The record shows by plain inference that the nature of the work being done on the forges and other appliances for iron work in the shop was such that it was practically impossible to prevent scrap iron from falling upon the floor around these instrumentalities. The evidence shows that there is ''most always more than one'' piece of scrap iron along the temporary passageway that plaintiff was required to take in carrying out the drawbar on account of the fact that there were forges, clamps, etc., along the north side and adjacent to this temporary passageway. However, there is no evidence that the scrap iron was permitted to fall in the regular passageway between the railroad tracks. This passageway was not immediately adjacent to these forges, etc. There was no reason why there should be any scrap iron in the regular passageway, and the clear inference from the testimony is that there was none.

However, the record shows that plaintiff tripped over a piece of the scrap iron that composed the pile at the base of sub-foreman Hall's forge. The clear inference is that this scrap iron fell from Hall's clamp; that Hall was responsible for its being there and that it remained there from Saturday's work until Monday morning. It was a few hours after the starting of the work on the latter day that plaintiff fell. The evidence also is that the general foreman gave explicit directions to all persons who were working on forges, clamps and other mechanisms where scrap iron was made to keep the scrap iron cleaned up. The custom was to clean up the scrap iron Saturday evening. However, it is not material in this case as to when the piece of scrap iron over which plaintiff fell was placed in the passage-way. Hall instructed plaintiff to carry the drawbar out. This was a heavy piece of iron and Hall knew that it was necessary for plaintiff to get a helper and that either he or the helper would be required to walk backwards to carry it through the temporary passageway. Uuder such circumstances defendant and its sub-foreman Hall were clearly negligent in having the piece of scrap iron over which

plaintiff fell in the passageway, that is, in permitting it
to remain therein as alleged in the petition. The negli-
gence consisted in permitting the scrap iron to remain in
the passageway when defendant's foreman knew that
plaintiff would use the passageway in the manner in
which the latter did use it. It makes no difference how
long said piece of scrap iron remained in the passageway,
or that plaintiff was injured by reason of the negligence
of his co-employee (if Hall was a fellow servant) who
was not engaged in interstate commerce at the time.
[Pederson v. Railroad, supra, 1. c. 151.]

It is insisted that plaintiff assumed the risk. The
evidence shows it became necessary either for plaintiff or
his helper to walk backward and that this aisle which he
used was the only one that could have been used by him;
that this passage that was used "was the only way."
While plaintiff must have known that scrap iron would
fall from the forges, clamps and like mechanisms being
used in the shop, he knew that the regular passageway
was unobstructed when open for use. He had, therefore,
a right to assume when the regular passageway was
closed that his foreman would not order him to do work
that would require him to walk backward over a tempo-
rary passageway without seeing that the same was free
from obstructions, at least, those that were made by the
sub-foreman himself. While the evidence shows that this
scrap iron could have been seen by anyone looking, it
would have been inconvenient for a man walking back-
ward to look for scrap iron in this passage. There is
nothing in the evidence to show that the scrap iron was so
close to plaintiff when he picked up the drawbar that he
could have seen it at that time, and we cannot say that
plaintiff assumed the risk in that he failed to keep his
head turned around toward his back during the time he
was carrying out the drawbar. Plaintiff had a right to
assume that the passageway was clear. It would appear
to one placed in the position that plaintiff was at the time
that it would have been more dangerous to have carried
the drawbar in the manner just described. Even under
the Federal rule plaintiff did not assume the risk.

Complaint is made of plaintiff's instruction No. 1 which it is claimed did not require the jury to find that plaintiff was injured while engaged in interstate commerce. There is no contradiction in the evidence on this point. It is also insisted that plaintiff's instruction No. 1 required defendant to make the passageway absolutely safe instead of reasonably safe. We do not think the instruction is subject to this criticism. It reads—

". . . if you find that the defendant, its servants, agents and employees had negligently and carelessly placed and permitted said scrap iron to be and remain in said passageway at the place where plaintiff is alleged to have been injured, and that said passageway and place was thereby rendered *dangerous* and *unsafe* and that plaintiff was injured because of such alleged negligence on the part of defendant, its servants, agents and employees, then your verdict and finding will be for plaintiff." (Italics ours.)

Plaintiff's instruction No. 2 defined negligence and carelessness as used in the instructions as—

". . . failure to exercise ordinary care; by the term ordinary care, is meant that degree of care usually exercised by careful and prudent persons under the same or similar circumstances;"

Defendant's instruction No. 1 defines negligence as—

". . . the doing of something an ordinarily prudent person placed in the same circumstances, would not have done, or the failure to do something that an ordinarily prudent person, under the same circumstances would have done."

It is insisted that the verdict is excessive. The evidence shows that plaintiff's helper testified that after the drawbar was carried out and laid down plaintiff acted as though he was hurt "bad" and that he helped him to the flag station which was "quite a ways," and that plaintiff "crippled along." When he was taken home plaintiff called the company's surgeon and went to bed. The surgeon came and put a plaster on plaintiff's back. The pain was so severe that plaintiff was unable to stay in bed and

"he got up and set up." He was able to walk around a little. The company's surgeon did not call upon him again. He was confined to the house three or four days when he called upon the company's surgeon who sent him to Quincy. He there saw Dr. Johnson "the railroad doctor" and Dr. Johnson examined him and took an X-ray picture and sent plaintiff back to Milan. After three weeks had transpired plaintiff had not improved materially and he then consulted Dr. Simmons, an osteopath, who examined him and told plaintiff that he would have to go to Kirksville to have an X-ray picture taken by Dr. Still. Dr. Simmons testified that plaintiff suffered from a sub-luxation of the lumbar vertebrae and that he replaced the lesion and plaintiff improved. Dr. Simmons treated plaintiff about three months. In the meantime plaintiff performed no physical labor and after the doctor finished treating him plaintiff was told by the doctor to do no lifting. Plaintiff remained at Milan a little over a year, during which time he engaged in no work except in "farming a little." During the time that plaintiff was farming he testified that his back was weak all the time, sometimes "I would be able to do no work and had to set down; I didn't have any grip." That he was nervous and unable to walk to the extent that he did before because he was weak in the back. He walked a little distance and would give out. Prior to the injury he weighed 150 or 155 pounds, at the time of the former trial he weighed about 138 pounds and has never weighed any more than that since. At the time of the last trial he weighed 132 pounds. At the time of his trial he lived in Carthage, Mo., and was engaged in dressing tools, "sharpening tools—just light work." He tried to do blacksmith work but was unable to do it. "I give out in the back." He also tried shoveling and had to quit that on account of his weak back. His back pained him at the time of the trial, on damp nights "I cannot hardly get out of bed, I have sharp pains through my back." He suffers from inability to sleep, at times he is able to sleep, at other times not, on account of his back paining him.

Dr. Simmons testified that when he first examined plaintiff he found considerable rigidity all along the lower part of the spine; at that time plaintiff could not bend in any direction, he did not have normal movement, either forward, backward or sideways, that he suffered from a sub-luxation of the lumbar vertebrae; that the doctor replaced the lesion and apparently plaintiff got well. The doctor evidently meant by ''apparently'' that plaintiff appeared to get well, as he afterwards testified that he did not mean to say that plaintiff was cured at that time and did not mean to say that he was cured at the time of the trial. There was sufficient evidence for the jury to find that plaintiff had not recovered at the time of the last trial, which was more than three years and a half after the injury. We do not think that the verdict is so large that an interference with it by this court would be warranted.

The judgment is affirmed. All concur.